Today is number 2214188 Tristan Tanner v. Stryker Corporation of Michigan. Good morning. May it please the Court, Counsel, my name is Robin Rose and I have the distinct honor and pleasure to represent Mr. Tristan Tanner with regard to this case. He is the appellant in the case and he is asking for a reversal of the summary judgment entered against him in favor of Stryker with regard to his FMLA claims for interference and retaliation. Today is an important day as I know most litigants feel when they are here before this Court and any distinguished panel of judges. But the reason this is so important is because as far as I can tell, there's been no other oral argument or certainly decision with regard to the issue that's presented, the initial underlying preliminary issue that's before your honors today. There are a few things in life that cannot be replicated, duplicated, do-overs or mulligans. Birth is one of them. And the presence of a parent at that birth is extraordinary. It has meaning, it has memories, it has purpose. The FMLA enacted in 1993 by Congress understood the importance of a parent's presence at the birth of their child. The interpretation of the FMLA with regard to the wording of that protection is that clear issue before your honors today. Fortunately, we have several tools at our disposal to assist the Court and certainly the litigants to determine what the proper interpretation is. First, we can look at the purpose of the FMLA, which is so clearly and distinctly stated as being known to balance the demands of the workplace with the needs of the families to entitle employees to take, quote, reasonable leave for medical reasons for the birth or adoption of a child and for the care of a child, spouse or a parent, etc. It also recognizes that these protections should be provided on a non-gender basis, meaning that they are equally applied. We understand that in this case, fathers will be most affected by the Court's decision today. Whether or not pre-birth leave, meaning some reasonable amount of time before the actual birth of a child, should be covered by the FMLA to ensure that a father or a parent is entitled to be present at the birth and receive the protection that's so important. Without that pre-birth leave, they may not be in a position to be present at the birth. The second thing that we can look at is statutory construction. And based upon all of the canons of construction that I included in the briefs, we argue that the only appropriate interpretation of the provisions, both in the statute as well as the interpretive regulation, is that the way the wording of the statute and regulations are set forth, the birth of the child, presence at the birth of the child, and for the care and bonding of the child thereafter, are separated into two distinct provisions. Why is that? Because they are different. One is because the birth of the child, to be present because of their birth of the child. The second one is to ensure that that parent has the opportunity to bond with that child. Before we get into the statute, let me ask you a question about Mr. Tanner specifically. So Mr. Tanner, as I understand it, took leave or tried to take leave in advance of the birth of his child. He needed to travel to where the mother is. And as I understand it, he accumulated the leave days before the birth even started, the number of leave days that created a problem for him with the company. And in fact, the unexcused absences had accrued before the birth had even occurred. So why are we going to spend all of our time discussing what the statute does as far as the actual birth of the child and what happens after that when it appears that he has the unexcused absences before we even got to the birth of a child? Because the underlying issue, Your Honor, and that's an excellent question, is whether or not the FMLA should provide and does provide a reasonable time for covered leave before the birth to ensure that a parent, such as Mr. Tanner, who had to travel out of state, he drove to be present. And then the baby came when she wanted. She was due on the 12th. But the statute says that an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period because of the birth of a son or daughter. Right. Okay. So why does that phrase, because of the birth of a son or daughter, not indicate that the birth of his daughter in this case is a necessary condition for Mr. Tanner to be covered by the FMLA?  We're not fighting over, okay, she went into labor on Monday and had the birth on Tuesday. We're not fighting over that. You're talking about the travel period before the birth. And the time that she was due on the 12th. Right. But we've got a statute that says because of the birth. Right. We would argue the plain meaning of that word means that because of the birth, the parent has the right to be present because of the birth. The parent has right to FMLA leave because of the birth. And we interpret because as plain meaning that because of the birth includes a time beforehand to ensure that they're present at the birth. In other words, let me put it another way. If the statute specifically covers a parent for leave to be present at the birth of the child, but the FMLA does not allow sufficient time beforehand to ensure that the parent is there and their job is protected at the birth, then it completely eradicates the whole meaning and protection for presence at the birth of the child. But then don't you run into subsection 2 that's called expiration of entitlement. The entitlement to leave under subparagraphs A and B shall expire at the end of the 12-month period beginning on the date of such birth. And that is because that's when the bonding period starts. And, Your Honor, I like that you brought up that section because what it does is it provides some certainty and protection to both the employer and the employee with regard to time frame. One of the things that Applee has argued is if there's this reasonable standard, which is in the statute to allow some pre-birth period of time that's covered to ensure that the parent then is present at the birth, doesn't leave their job on the way to the birth, what do we have to guarantee some kind of certainty? We have the 12 weeks, and we have that period that would just start earlier. It wouldn't end any longer or it wouldn't extend any longer. So it just would ensure that that 12-week starts a little bit earlier. But, see, this is where you're running into the terms of the statute, beginning on the date. You're calling for it to be this sort of rotating 12-month period, and so we're going to shift it a little earlier for Mr. Tanner because he's decided he needs two weeks or whatever before the birth of the child to travel and make arrangements. So this would just move, that it's a 12-month period that would just sort of move. But this says beginning on the date of. Right, because that's, Your Honor, when the bonding period starts. That's when the bonding period starts. There are two different provisions, and we would argue that under the rules of statutory construction, that if, in fact, 1 and 2 were not different, and that the birth starts that period, and that's all you have to worry about, then only provision 2 would be there. That renders 1 meaningless. There are two different things, the right to have coverage because of the birth, and then the right to bond with the child after the birth. Two different things. If you only look at two, you've rendered 1 meaningless. And how can a parent who doesn't have PTO time or has run out of PTO time, who has to travel out of state, a man who works in oil rigs in Texas or a woman, a man who works in the oil rigs in the Gulf of Mexico, and he doesn't have PTO time left, but he wants to get to the birth of his child who's in North Carolina, does that mean he has to make that incredible, difficult, impossible choice? Do I not leave my job and risk losing it, or do I go and meet with my wife, my girlfriend, and be present for an extraordinary event that I can never duplicate? That's the choice that this interpretation of the statute would force on every parent in that position. And, Your Honor, here's why we think that this has never been before court before. Because in those circumstances, the employer did the right thing and allowed some pre-birth period of time for that parent to get to the presence of the birth of their child. And one other thing, because I think this is important to your point, is that he was approved for July the 26th through October 16th, I think, sometime in October. And they knew, the company knew all along that he was anticipating using some of that time for travel. He made it clear. This is a man who engaged in constant dialogue with the employer to ensure that he understood what his rights were, to understand what he could do to ensure that he got it. Well, the record reflects that the employer repeatedly told him that the leave begins at the birth of the child, wasn't he? Am I wrong about the record? He didn't understand that until July 30th. And why that's important, and this raises another point, is that although Lynn, Ms. Lynn, who was the leave specialist who communicated with him on his leave, both the parental leave policy as well as the FMLA leave policy that Stryker had in place, told him, you don't get any time until the baby's born. Oh, that means I can't be there for the birth? No, once the baby's born, then your leave starts. But yet, when the form was filled out, the designation, the notice approving him for his leave, it must have been some kind of FMLA-approved form. It was checked for both birth and bonding, and you had a choice. If there's a choice, that means there are two different events, and they have to be interpreted differently because they're separate. And the court, I mean, and Congress enacted them separately for a reason. That's why I also said reasonable time, and that's a standard we see in ADA accommodation cases. We see imposed all the time, and it's not an unwieldy type of standard. It's something that the courts are familiar with, that employers should be familiar with, and honestly, if the dialogue that Mr. Tanner had tried to continue for the week before that baby was born, while her birth was delayed and she wasn't coming and he didn't know what to do, if they had communicated with him, they ignored him. And that shows that they had no intention of doing anything but letting this man go because they knew he was going to start his 12-week leave as soon as that baby was born, and they didn't want anything to do with it. And had they applied the FMLA correctly, even if they had said the due date forward, and we submit that it should be earlier than that, he would not be in this position. They had the baby born on the day his ex-girlfriend went into labor. We wouldn't be here today. But because our labor continued to the next day, they fired him then. So my time's up. I apologize. Thank you for your time. I didn't get to everything, but we appreciate that it's an important issue and appreciate Your Honor's time and hope that you will reverse the summary judgment. May it please the Court. My name is Jenna Recife. I represent Stryker Corporation of Michigan, the appellee in this appeal. To respond to Appolin's first point, Congress did not put birth and bonding leave in two separate provisions. 29 U.S.C. Section 2612A.1, capital A, actually puts those two provisions into the same section, those two protections into the same provision, and states that a person will be entitled to 12 weeks of leave because of the birth of a son or daughter of the employee and in order to care for such son or daughter. With regard to the regulation, Department of Labor does the same thing. It puts the provision into A.1 and 2, but in A.2, which Appellant is very focused on, saying that the birth date is not the beginning of the leave for birth, it's only the beginning of the leave for bonding, overlooks that there's an explicit sentence in that provision that says, an employee's entitlement to FMI leave for a birth expires at the end of the 12-month period beginning on the date of the birth. So both Congress and the Department of Labor have explicitly put these provisions together and provided that the leave would start on the date of the birth. Notwithstanding, to the extent the court does find Tristan Tanner's argument provocative, should there be a court-fashioned rule that provides for leave pre-birth to allow for travel? Not in this case. Congress said in the statute, it made its finding that the FMLA was being enacted in part because the lack of employment policies for working parents can force individuals to choose between job security and parenting. And the purpose of the act was to entitle employees to take reasonable leave for the birth of a child, so that they weren't put in that position. Here, Stryker had in place PTO, vacation and sick leave policies, that provided Mr. Tanner with reasonable pre-birth leave, such that the FMLA does not need to step in to fill that space. Specifically, Stryker had a policy that allowed Mr. Tanner to take vacation and sick leave in advance of the birth of his child to travel as needed to get to the location where the birth mother was, Connecticut. Mr. Tanner was in Florida. The challenge in this case for Mr. Tanner is that he didn't use that vacation policy and that sick leave policy in the reasonable manner that he proposes this court should implement a rule to protect him from himself. Instead, what he did was he burned his vacation and sick leave, five days of it, during the period from August 2 to August 6. And he did that, misrepresenting to Stryker that his daughter was expected to be born any day that week. That's what he said. And that he needed to leave to Connecticut because of that. Stryker allowed him to take the four days of vacation that he had remaining, August 2, 3, 4, and 5, and an additional sick day, August 6, so that he could, consistent with what he told Stryker, get to Connecticut because his daughter was, as he said, expected to be born any day that week. And what did he do? Did he leave for Connecticut? No, he didn't. He stayed right there in Tampa, Florida. In his testimony, which is in the record, he states, when asked, what were you doing during that time?  He leaves August 8, because he knows by July 20 that his daughter's due date had been changed to August 12. He arrives in Connecticut August 9, and awaits his daughter's birth. So now, 9, August 9, 10, 11, and 12, he burns the remainder of the sick days that he had outstanding with Stryker, pursuant to Stryker's leave policies. She wasn't born the 12th. Babies come when they want to. Starting August 13, he now has no leave available, no leave remaining, and he's in a position to be subject to this policy that says, if you don't have any leave available, you're going to incur two occurrence points for each unexcused absence. So starting Friday, August 13, he incurs his first two points. Why is this significant? It's really significant because after misrepresenting to Stryker that he needed leave from August 2 to August 6, because he expected his daughter to be born any day that week and he needed to leave, he didn't. He hung around Tampa, packing, planning, and preparing, according to him,  those five days of leave that he burned are the same five days of leave that he needed on the tail end of that period to have gotten him up to August 19, the date of her birth. Had he not spuriously burned that leave from August 2 to August 6, he would have covered August 13, August 14, August 15. No, I'm sorry, the 14th and the 15th are Saturday and Sunday. He doesn't need to burn leave. August 13, August 16, August 17, and August 18. Four days. He'd have had a day to spare. She's born August 19. Definitely kicks in date of birth. No one can dispute that. And he'd have been fine. But instead of properly using the leave policy that Stryker had in place, he misused it and incurred the result that he knew existed. So the record, the undisputed record, reflects that as of July 9, he was told by Stryker that he would need to use his vacation and sick in order to cover pre-birth leave. Let me ask you a question. Do we need to decide whether the FMLA would cover the 18th? Because I could see an argument that the birth began on the 18th and finished on the 19th. I could too, and no, we don't. Tell me why. Because he had already incurred the points by then? He had. He sure had. So under the Stryker policy, five occurrence points, this supports termination decision. And he incurs two per day under the policy. On the 13th, he's incurred two. On the 16th, he's incurred two. On the 17th, he's incurred two. That's six points. To supplement that answer, Your Honor, on the 17th, he is communicating with Stryker, and nobody is ignoring the communications. In the record, there are email exchanges between him and Adigeo and him and Lynn, and he says in an August 17th email with Lynn when he's told, if you have unexcused absences that you don't have the leave to cover, you will incur points. He says on August 17th, well, I guess I'll just have to take the points then. There's nothing else I can do. He knows by that date he's incurring the points, and he's accepting it and he's saying, that's what I have to do. And by that date, he's incurred all the points that it takes to support the termination. So, no, we don't need to make a decision about whether the 18th is FMLA protected. So what happens here in this case is he abused his leave, he lied about it, and now he runs to the court to say, protect me. That's the rule of reasonableness. Maybe that's a fair rule to ask for, but not in this case, not today, not this court. This court can simply affirm the district court's decision because Tristan Tanner is not entitled to have this court protect him from his own misconduct. To the extent the court would like to hear argument with regard to the interference and retaliation-specific claims, I'd like to address those briefly. The district court held that Stryker had not interfered with Tristan Tanner's FMLA use. Based on its finding that his FMLA rights did not begin until birth. I propose to this court that's a correct finding, based on the arguments just presented, that for Tristan Tanner's facts and circumstances, his leave started at birth with his daughter. And by that point in time, he had lost that right by violating the policy and subjecting himself to termination. Therefore, there could be no interference because he had no right to FMLA leave at that point. Notwithstanding, as the district court addressed also in its order, even if this court were to say, I'm going to say arguably there's an interference as a prima facie finding. The bottom line is causation is stopped because of his intervening misconduct. The decision of Stryker to terminate him for his own misconduct cuts off causation. And in the end, their decision is wholly unrelated to the FMLA. It's based on his misconduct. With regard to the retaliation claim, similar analysis applies. His causation, the causation on the prima facie case is suspended by, is superseded by his act of misconduct. And moreover, there's no pretext based on Stryker's reasonable, legitimate decision to terminate his employment based on his misconduct because the close temporal proximity is insufficient to overcome it on its own. But moreover, he was subject to the policy. To the extent that Tanner has presented an argument that he was, quote, customer facing, the plain language of the policy itself states that even for customer facing employees, if one were to even buy that argument, it only applies if the employee is also non-exempt and did not have a specified set shift. That's an explicit, that's expressed language in the policy itself. So the sort of passing argument that they make that he was customer facing, which testimony is given outside of the context of this particular issue anyhow, is not persuasive because the policy overrides that as an argument anyhow. And secondly, the policy allows for discretion in terms of whether or not disciplinary actions are going to be issued along the way. Notably, the policy states that accumulation of occurrence points within a rolling 12-month period will generally result in the following disciplinary actions and walks through getting a verbal warning at one point, a written warning first at two points, et cetera. Notably, that's talking about it in the context of a rolling 12-month period. That might be useful for us here if it talked about it was in a rolling four-day consecutive period, which is what we have here, but it is simply not practical to even contemplate the issuance of discipline when the gentleman incurs two points per violation on four consecutive days of absence and literally is not at work during that time frame. So if your honors have no questions, I'll take my seat. Thank you. Yes, you have time left for rebuttal. You have three minutes. I would ask the court to review the facts again. Unfortunately, counsel Florapoli did not address everything that happened during the week before Mr. Tanner left. He had a COVID vaccine, that second vaccine that resulted in some illness. So he wasn't just packing and planning. He also had some illness associated with it. I know no statute, regulation, or case law that allows an employer to evaluate or a court to evaluate how an employee has used their PTO time in deciding whether or not they're entitled to FMLA. FMLA was enacted for the very purpose of protecting a job, even when an employee does not have that time available to them, PTO that is. To allow the employer to basically denigrate the employee for how he used his time, call him a liar, which he wasn't. They only provided part of the email in the facts as to what his ex-girlfriend told him about the time. She said the baby could come any day. This is when she's expected, but she could come any day. If we were to adopt your interpretation of the FMLA, where would we draw the line as to when his leave should begin? We would suggest that a reasonable time for him to get there would be appropriate. Certainly, the due date would be another appropriate date. That's a good question because we have thought about that. I think it's a fact question for a jury to determine what is a reasonable time frame. Since there was not an interactive dialogue in which the employer and the employee came to a time frame as they would under the ADA reasonable accommodation, I think it would definitely be enough time for him to get there and be present at the birth. So every time the employer disagreed with the employee about when the leave should begin, we'd have a jury question? Is that what you're saying? Well, in this particular case, they wouldn't even interact with him in a dialogue about anything other than when the day the baby was born, even though they knew and approved him for July 26, incorporating time for him to get up there. Then later, they said, no, Lynn tells him, no, it's not until the baby is born. At that point in time, what does he do? And when he's up there and the baby isn't born yet, what does he do? Does he fly home or does he drive back home and not lose his job? Or does he wait in case she does exactly what she did, was present herself on the 18th, even though the doctor was going to actually induce that day. They painted this man as a horrible employee. He was a great employee. He had a great review. And to call him a liar and to denigrate his character in front of this court is just unbelievable. All he did was do a good job for them and then want to be there when his daughter was born. How he used his PTO is irrelevant. Thank you, judges. Court is adjourned. Thank you.